# EXHIBIT A



Copyright © 1981 and Published by: The Association
of Ship Brokers & Agents (U.S.A.), Inc. (ASBA), New York.
This derivative work may not be copied without
the permission of the copyright owners.
Code Name: ASBATIME

**LB CHARTERING LLC.**
*27 SIGNAL ROAD*
*STAMFORD CONNECTICUT, 06902*
*PHONE: 203-967-1866  FAX: 203-975-9138*
*EMAIL: BROKERS@LBCHARTERING.COM*

# TIME CHARTER
## New York Produce Exchange Form

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946; June 12th, 1981

|  |  |
|---|---|
| | THIS CHARTER PARTY, made and concluded in *Stamford, Connecticut,*..................... 1 |
| | .....................................*20th* day of *November, 2009* ........~~19~~........ 2 |
| **Owners** | between *PROGRESS BULK CARRIERS LTD., of Nassau, Bahamas, as*....................... 3 |
| | ....................................................................*disponent* Owners of 4 |
| **Description** | the good ....................................~~Steamship/~~ Motorship *"BENARITA" (See Clause 39)* 5 |
| **of** | ~~of .................................................of ...............................tons gross register, and~~ 6 |
| **Vessel** | ~~.........................................tons net register, having engines of~~ .......................... 7 |
| | ~~horsepower and with hull, machinery and equipment in a throughly efficient~~ 8 |
| | ~~state, and classed~~ ...................................................................... of about 9 |
| | ~~.......................................................cubic feet grain/bale capacity~~ ..................... 10 |
| | ~~.................................................................................................., and about~~ 11 |
| | ~~................................................long/metric tons deadweight capacity (cargo and~~ 12 |
| | ~~bunkers, including fresh water and stores not exceeding~~ ............................................. 13 |
| | ~~long/metric tons) on a salt water draft of~~ ....................................~~on summer~~ 14 |
| | ~~freeboard, inclusive of permanent bunkers, which are of the capacity of about~~ 15 |
| | ~~....................................................................................long/metric tons of~~ 16 |
| | ~~.......................................................fuel oil and~~ .......................... 17 |
| | ~~long/metric tons of....................................................................., and~~ 18 |
| | ~~capable of steaming, fully laden, under good weather conditions about~~ 19 |
| | ~~......................................knots on a consumption of about~~.......................... 20 |
| | ~~long/metric tons of~~................................................................................ 21 |
| | 22 |
| | now *vessel is discharging grains in Damietta (Acct Nibulon). Vessel berthed alongside* 23 |
| | *quay No.16 on 19.11.2009. Kindly note that vessel is under samples' inspection. Prospects* 24 |
| | *for commencing discharging on 22.11.2009 ETC: 27.11.2009* |

now  *vessel is discharging grains in Damietta (Acct Nibulon). Vessel berthed alongside* 23
*quay No.16 on 19.11.2009. Kindly note that vessel is under samples' inspection. Prospects* 24
*for commencing discharging on 22.11.2009 ETC: 27.11.2009*  and 

**Charterers**
.................................................................................................... 25
.....*EGYPTIAN BULK CARRIERS  as* .......... Charterers of the City of ......................... 26

**Duration**
The Owners agree to let and the Charterers agree to hire the vessel from the 27
time of delivery for ~~about~~ *a timecharter trip via safe ports/, safe berth/s, safe* 28
*anchorage/s, always afloat, always within I.W.L. - intention bulk, harmless* 29
*grains/agriculturals to Iraq - duration minimum 39 days,*  within below mentioned 30
trading limits. 

**Sublet**
Charterers shall have liberty to sublet the vessel for all or any part of the 31
time covered by this Charter, but Charterers shall remain responsible for the 32
fulfillment of this Charter. 33

**Delivery**
Vessel shall be placed at the disposal of the Charterers *on dropping last outward* 34
*sea pilot Damietta, at any time, day or night, Sundays and holidays included.* 35
.................................................................................................... 36
.................................................................................................... 37
~~in such dock or at such berth or place (where she may safely lie, always afloat,~~ 38
~~at all times of tide, except as otherwise provided in Clause 6) as the Charterers~~ 39
~~may direct. If such dock, berth or place be not available, time shall count as~~ 40
~~provided in Clause 5.~~ Vessel on her delivery shall be ready to receive cargo with 41
clean-swept holds and tight, staunch, strong and in every way fitted for ordi- 42
nary cargo service, having water ballast and with sufficient power to operate all 43
cargo-handling gear simultaneously (and with full complement of officers and 44
crew for a vessel of her tonnage), to be employed in carrying lawful merchan- 45

**Dangerous**
**Cargo**
dise excluding any goods of a dangerous, injurious, flammable or corrosive 46
nature unless carried in accordance with the requirements or recom- 47

| | | |
|---|---|---|
| **Cargo Exclusions** | mendations of the proper authorities of the state of the vessel's registry and of the states of ports of shipment and discharge and of any intermediate states or ports through whose waters the vessel must pass. Without prejudice to the generality of the foregoing, in addition the following are specifically excluded: livestock of any description, arms, ammunition, explosives *(See Claues 40)*.................. | 48 49 50 51 52 |
| | ....................................................................................................................... | 53 |
| | ....................................................................................................................... | 54 |
| | ....................................................................................................................... | 55 |
| | ....................................................................................................................... | 56 |
| **Trading Limits** | The vessel shall be employed in such lawful trades between safe ports and places ~~within~~   *worldwide  trading,  always  within  Institute  Warranty  Limits* ............................................................................... excluding *(See Clause 41)* .... | 57 58 59 |
| | ....................................................................................................................... | 60 |
| | ....................................................................................................................... | 61 |
| | ....................................................................................................................... | 62 |
| | as the Charterers or their agents shall direct, on the following conditions: | 63 |
| **Owners to Provide** | 1.   The Owners shall provide and pay for the insurance of the vessel and for all provisions, cabin, deck, engine-room and other necessary stores, in- cluding boiler water;  shall pay for wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the crew; shall maintain vessel's class and keep her in a thoroughly efficient state in hull, machinery and equipment for and during the service. | 64 65 66 67 68 69 |
| **Charterers to** | 2.   The Charterers, while the vessel is on hire, shall provide and pay for all the fuel except as otherwise agreed, port charges, *compulsory and customary* pilotages, towages, agen- | 70 71 |
| **Provide** | cies, commissions, consular charges (except those pertaining to individual crew members or flag of the vessel), and all other usual expenses except those stated in Clause 1, but when the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew shall be for Owners' account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this Charter shall be for Charterers' account. All other fumigations shall be for Charterers' account after vessel has been on charter for a continuous period of six months or more. | 72 73 74 75 76 77 78 79 80 |
| | Charterers shall provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but Owners shall allow them the use of any dunnage and shifting boards already aboard vessel. | 81 82 83 84 |
| **Bunkers** | 3.   *(See Clause 88)* ~~The Charterers on delivery, and the Owners on redelivery, shall take~~ | 85 |
| **on Delivery and Redelivery** | ~~over  and  pay  for  all  fuel  and  diesel  oil  remaining  on  board  the  vessel  as hereunder. The vessel shall be delivered with:~~ ............................................................. | 86 87 |
| | ~~long/metric* tons of fuel oil at the price of~~ ......................................................~~per ton;~~ | 88 |
| | ...........................................................~~tons of diesel oil at the price of~~ ............................. | 89 |
| | ~~per ton. The vessel shall be redelivered with:~~ ................................................................... | 90 |
| | ~~tons of fuel oil at the price of~~ .........................................................~~per ton;~~ ....................... | 91 |
| | ..........................................~~tons of diesel oil at the price of~~ ............................~~per ton~~ | 92 |
| | ....................................................................................................................... | 93 |
| | ....................................................................................................................... | 94 |
| | ~~(*Same tons apply throughout this clause)~~ | 95 |
| **Rate of Hire** | 4.   The Charterers shall pay for the use and hire of the said vessel at the rate of *$28,000.00 (twenty eight thousand dollars)* .... daily, or *pro rata including overtime payable fifteen (15) days in advance in*  .................................... United States Currency ~~per  ton  on  vessel's  total  deadweight  carrying  capacity,  including  bunkers  and stores, on~~ ..............................................................~~summer freeboard, per calendar month,~~ commencing on and from the day *and time* of her delivery, as aforesaid, and at and after | 96 97 98 99 100 101 |
| **Redelivery Areas and Notices** | the same rate for any part of a ~~month~~ *day*; hire shall continue until the hour of the day of her redelivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless vessel lost)~~at~~ *on passing Muscat outbound at any time, day or night, Sundays and holidays included,*  ....................................................... | 102 103 104 105 |
| | ....................................................................................... unless otherwise mutually agreed. | 106 107 |
| | Charterers shall give Owners not less than  *20/15/10/5/3/2/1* .................... days notice of vessel's expected date of redelivery and probable port  ......................................... | 108 109 |

**Hire**
**Payment**
**and**
**Commencement**

................................................................................................ 110

    5.   Payment of hire shall be made so as to be received by Owners or their 111
designated payee in New York, i.e. *( See Clause 64)*................................................. 112

................................................................................................ 113

................................................................................................ 114

...................................................... in United States Currency, in funds 115
available to the Owners on the due date, *fifteen (15) days* ~~semi-monthly~~ in advance, 116
and for the
last ~~half month~~ *fifteen (15) days*  or part of same the approximate amount of hire, and 117
should
same not cover the actual time, hire shall be paid for the balance day by day as 118
it becomes due, if so required by Owners. Failing the punctual and regular 119
payment of the hire, or on any breach of this Charter, the Owners shall be at 120
liberty to withdraw the vessel from the service of the Charterers without pre- 121
judice to any claims they (the Owners) may otherwise have on the Charterers. 122
~~Time shall count from 7 A.M. on the working day following that on~~ 123
~~which written notice of readiness has been given to Charterers or their agents~~ 124
~~before 4 P.M., but if required by Charterers, they shall have the privilege of~~ 125
~~using vessel at once, in which case the vessel will be on hire from the com-~~ 126
~~mencement of work.~~ 127

**Cash**
**Advances**

~~Cash for vessel's ordinary disbursements at any port may be advanced,~~ 128
~~as required by the Captain, by the Charterers or their agents, subject to 2 1/2~~ 129
~~percent commission and such advances shall be deducted from the hire. The~~ 130
~~Charterers, however, shall in no way be responsible for the application of such~~ 131
~~advances.~~ 132

**Berths**

    6.   Vessel shall be loaded and discharged in any dock or at any berth or 133
place that Charterers or their agents may direct, provided the vessel can safely 134
lie always afloat at any time of tide, except at ~~such places~~ *River Plate, Argentina,* 135
*Brazil, Buenaentura and Suada* where it is customary
for similar size vessels to safely lie aground. 136

**Spaces**
**Available**

    7.   The whole reach of the vessel's holds, decks, and usual places of 137
loading (not more than she can reasonably and safely stow and carry), also 138
accommodations for supercargo, if carried, shall be at the Charterers' dis- 139
posal, reserving only proper and sufficient space for ship's officers, crew, 140
tackle, apparel, furniture, provisions, stores and fuel. 141

**Prosecution**
**of**
**Voyages**

    8.   The Captain shall prosecute his voyages with due despatch, and shall 142
render all customary assistance with ship's crew and boats. The Captain 143
(although appointed by the Owners) shall be under the orders and directions of 144
the Charterers as regards employment and agency; and Charterers are to 145
perform all cargo handling at their expense under the supervision of the 146
Captain, who is to sign the bills of lading for cargo as presented in conformity 147
with mate's or tally clerk's receipts. However, at Charterers' option, the Chart- 148
erers or their agents may sign bills of lading on behalf of the Captain always in 149

**Bills**
**of**
**Lading**

conformity with mate's or tally clerk's receipts. All bills of lading shall be 150
without prejudice to this Charter and the Charterers shall indemnify the Own- 151
ers against all consequences or liabilities which may arise from any inconsis- 152
tency between this Charter and any bills of lading or waybills signed by the 153
Charterers or their agents or by the Captain at their request. 154

**Conduct of**
**Captain**

    9.   If the Charterers shall have reason to be dissatisfied with the conduct of 155
the Captain or officers, the Owners shall, on receiving particulars of the 156
complaint, investigate the same, and, if necessary, make a change in the 157
appointments. 158

**Supercargo**
**and**
**Meals**

    10. The Charterers are entitled to appoint a supercargo, who shall accom- 159
pany the vessel and see that voyages are prosecuted with due despatch. He is 160
to be furnished with free accommodation and same fare as provided for 161
Captain's table, Charterers paying at the rate of *USD 10.00*........................... per day. 162
Owners shall victual pilots and customs officers, and also, when authorized by 163
Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc., 164
Charterers paying at the rate of *USD 5.00* per meal for all such victual- 165
ling. *(See Clause 89).* 166

**Sailing**
**Orders**
**and Logs**

    11. The Charterers shall furnish the Captain from time to time with all 167
requisite instructions and sailing directions, in writing, and the Captain shall 168
keep full and correct deck and engine logs of the voyage or voyages, which are 169
to be patent to the Charterers or their agents, and furnish the Charterers, their 170
agents or supercargo, when required, with a true copy of such deck and engine 171

logs, showing the course of the vessel, distance run and the consumption of 172
fuel. 173

**Ventilation** 12. The Captain shall use diligence in caring for the ventilation of the 174
cargo. 175

**Continuation** 13. The Charterers shall have the option of continuing this Charter for a 176
further period of ................................................................................................ 177
.................................................................................................................................... 178

**Laydays/** 14. If required by Charterers, time shall not commence before *November 26th,* 179
**Cancelling** *2009* ...................................... and should vessel not have *been delivered* ~~given written~~ 180
~~notice of readiness~~ on or before ..*December 2nd, 2009 ,* .................................... ~~but not~~ 181
~~later than 4 P.M.~~ Charterers or their agents shall have the option of cancelling 182
this Charter at any time not later than the day of vessel's readiness. 183

**Off** 15. In the event of the loss of time from deficiency and/or default of officers 184
**Hire** or crew or deficiency of stores, fire, breakdown of, or damages to, hull, 185
machinery or equipment, grounding, detention by average accidents to ship or 186
cargo unless resulting from inherent vice, quality or defect of the cargo, 187
drydocking for the purpose of examination or painting bottom, or by any other 188
similar cause preventing the full working of the vessel, the payment of hire and 189
overtime, if any, shall cease for the time thereby lost. Should the vessel deviate 190
or put back during a voyage, contrary to the orders or directions of the 191
Charterers, for any reason other than accident to the cargo, the hire is to be 192
suspended from the time of her deviating or putting back until she is again in 193
the same or equidistant position from the destination and the voyage resumed 194
therefrom. All fuel used by the vessel while off hire shall be for Owners' 195
account. In the event of the vessel being driven into port or to anchorage 196
through stress of weather, trading to shallow harbors or to rivers or ports with 197
bars, any detention of the vessel and/or expenses resulting from such deten- 198
tion shall be for the Charterers' account. If upon the voyage the speed be 199
reduced by defect in, or breakdown of, any part of her hull, machinery or 200
equipment, the time so lost, and the cost of any extra fuel consumed in 201
consequence thereof, and all extra expenses shall be deducted from the hire. 202

**Total** 16. Should the vessel be lost, money paid in advance and not earned 203
**Loss** (reckoning from the date of loss or being last heard of) shall be returned to the 204
Charterers at once. 205

**Exceptions** The act of God, enemies, fire, restraint of princes, rulers and people, 206
and all dangers and accidents of the seas, rivers, machinery, boilers and steam 207
navigation, and errors of navigation throughout this Charter, always mutually 208
excepted. 209

**Liberties** The vessel shall have the liberty to sail with or without pilots, to tow and 210
to be towed, to assist vessels in distress, and to deviate for the purpose of 211
saving life and property. 212

**Arbitration** 17. Should any dispute arise between Owners and the Charterers, the 213
matter in dispute shall be referred to three persons at ~~New York~~ *London*, one to be 214
appointed by each of the parties hereto, and the third by the two so chosen; 215
their decision, or that of any two of them, shall be final and for the purpose of 216
enforcing any award this agreement may be made a rule of the Court. The 217
arbitrators shall be commercial men conversant with shipping matters. *English law to* 218
*apply.* 

**Liens** 18. The Owners shall have a lien upon all cargoes and all sub-freights for 219
any amounts due under this Charter, including general average contributions, 220
and the Charterers shall have a lien on the ship for all monies paid in advance 221
and not earned, and any overpaid hire or excess deposit to be returned at once. 222
Charterers will not suffer, nor permit to be continued, any lien or encumbrance 223
incurred by them or their agents, which might have priority over the title and 224
interest of the Owners in the vessel. 225

**Salvage** 19. All derelicts and salvage shall be for Owners' and Charterers' equal 226
benefit after deducting Owners' and Charterers' expenses and crew's propor- 227
tion. 228

**General** General average shall be adjusted, according to York-Antwerp Rules 229
**Average** 1974, *and any amendments thereto,* at such port or place ~~in the United States~~ as may 230
be selected by the
Owners and as to matters not provided for by these Rules, according to the 231
laws and usage at the port of ~~New York~~ *London*. In such adjustment disbursements 232
in
foreign currencies shall be exchanged into United States money at the rate 233

prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the Owners, must be furnished before delivery of the goods. Such cash deposit as the Owners or their agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the Owners before delivery. Such deposit shall, at the option of the Owners, be payable in United States money and remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the general average and refunds or credit balances, if any, shall be paid in United States money.

**York-Antwerp Rules**

Charterers shall procure that all bills of lading issued during the currency of the Charter will contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules 1974, *and any amendments thereto* and will include the "New Jason Clause" as per Clause 23.

**Drydocking**

20. ~~The vessel was last drydocked~~................................................................~~. The Owners shall have the option to place the vessel in drydock during the currency of this Charter at a convenient time and place, to be mutually agreed upon between Owners and Charterers, for bottom cleaning and painting and/or repair as required by class or dictated by circumstances. Payment of hire shall be suspended upon deviation from Charterers' service until vessel is again placed at Charterers' disposal at a point not less favorable to Charterers than when the hire was suspended~~................................................................

*No drydocking during this Charter Party period unless in case of emergency.*
................................................................

**Cargo Gear**

21. Owners shall maintain the cargo-handling gear of the ship ~~which is as follows:~~ ................................................................
................................................................
................................................................,
providing gear (for all derricks or cranes) capable of lifting capacity as described. Owners shall also provide on the vessel for night work lights as on board, but all additional lights over those on board shall be at Charterers' expense. The Charterers shall have the use of any gear on board the vessel. If required by Charterers, the vessel shall work night and day and all cargo-handling gear shall be at Charterers' disposal during loading and discharging.

**Stevedore Stand-by**

In the event of disabled cargo-handling gear, or insufficient power to operate the same, the vessel is to be considered to be off hire to the extent that time is actually lost to the Charterers and Owners to pay stevedore stand-by charges occasioned thereby. If required by the Charterers, the Owners are to bear the cost of hiring shore gear in lieu thereof.

**Crew Overtime**

22. ~~In lieu of any overtime payments to officers and crew for work ordered by Charterers or their agents, Charterers shall pay Owners $~~....................................~~ per month or pro rata.~~

**Clauses Paramount**

23. The following clause is to be included in all bills of lading issued hereunder:

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such term shall be void to that extent, but no further.

This Charter is subject to the following clauses all of which are to be included in all bills of lading issued hereunder:

**New Both-to-Blame Collision**

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her

| | | |
|---|---|---|
| Clause | owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier. | 298 299 300 301 302 |

owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier. 298 299 300 301 302

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact. 303 304 305

**New Jason Clause**

In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. 306 307 308 309 310 311 312 313

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. 314 315 316 317 318 319

**War Clauses**

(a)  No contraband of war shall be shipped. Vessel shall not be required, without the consent of Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration of war or not, where vessel, cargo or crew might reasonably be expected to be subject to capture, seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de facto authority or any purported governmental organization maintaining naval, military or air forces). 320 321 322 323 324 325 326 327 328

(b) If such consent is given by Owners, Charterers will pay the provable additional cost of insuring vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not exceeding a valuation of .................................................... In addition, Owners may purchase and Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements, total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a government program, vessel shall not be required to enter or remain at any such port or zone. 329 330 331 332 333 334 335 336

(c) In the event of the existence of the conditions described in (a) subsequent to the date of this Charter, or while vessel is on hire under this Charter, Charterers shall, in respect of voyages to any such port or zone assume the provable additional cost of wages and insurance properly incurred in connection with master, officers and crew as a consequence of such war, warlike operations or hostilities. 337 338 339 340 341 342

**Ice**

24. The vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter and remain in the port or area or to get out after having completed loading or discharging. *Vessel not to trade in ice nor to follow icebreaker.* 343 344 345 346 347 348

**Navigation**

25. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners shall remain responsible for the navigation of the vessel, acts of pilots and tug boats, insurance, crew, and all other similar matters, same as when trading for their own account. 349 350 351 352

**Commissions**

26. A commission of .................................*1.25%* percent is payable by the vessel and Owners to *LB CHARTERING LLC.,* ......................................................................... ......................................................................................................................................... on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter. 353 354 355 356 357

**Address**

27. An address commission of .....................................................*3.75%* percent is payable to *the Charterers* ........................................................................................ ......................................................................................................................................... on hire earned and paid under this Charter. 358 359 360 361

**Rider**

Rider Clauses  *39 to 98* ............................................................................ as at- 362

tached hereto are incorporated in this Charter.

363

## Rider of Suggested Additional Clauses

(None of these Clauses apply unless expressly agreed during the negotiations and enumerated in line 362)

| | | |
|---|---|---|
| **Extension of Cancelling** | 28. If it clearly appears that, despite the exercise of due diligence by Owners, the vessel will not be ready for delivery by the cancelling date, and provided Owners are able to state with reasonable certainty the date on which the vessel will be ready, they may, at the earliest seven days before the vessel is expected to sail for the port or place of delivery, require Charterers to declare whether or not they will cancel the Charter. Should Charterers elect not to cancel, or should they fail to reply within seven days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date of readiness for delivery as notified by Owners shall replace the original cancelling date. Should the vessel be further delayed, Owners shall be entitled to require further declarations of Charterers in accordance with this Clause. | 364 365 366 367 368 369 370 371 372 373 374 |
| **Grace Period** | 29. Where there is failure to make "punctual and regular payment" of hire, Charterers shall be given by Owners two clear banking days (as recognised at the agreed place of payment) written notice to rectify the failure, and when so rectified within those two days following Owners' notice, the payment shall stand as regular and punctual. Payment received by Owners' bank after the original due date will bear interest at the rate of 0.1 percent per day which shall be payable immediately by Charterers in addition to hire. | 375 376 377 378 379 380 381 |
| | At any time while hire is outstanding the Owners shall be absolutely entitled to withhold the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever for any consequences thereof in respect of which the Charterers hereby indemnify the Owners and hire shall continue to accrue and any extra expenses resulting from such withholding shall be for the Charterers' account. | 382 383 384 385 386 387 |
| **Cargo Claims** | 30. Damage to and claims on cargo shall be for Owners' account if caused by unseaworthiness of the vessel, but shall be for Charterers' account if caused by handling and stowage, including slackage. Claims for shortage ex ship shall be shared equally between Owners and Charterers. | 388 389 390 391 |
| **War Cancellation** | 31. In the event of the outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries: The United States of America, the United Kingdom, France, the Union of Soviet Socialist Republics, the People's Republic of China,.................................................................... ............................................................................................................................ ............................................................................................................................ or in the event of the nation under whose flag the vessel sails becoming involved in war (whether there be a declaration of war or not), either the Owners or the Charterers may cancel this Charter. Whereupon the Charterers shall redeliver the vessel to the Owners in accordance with Clause 4; if she has cargo on board, after discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall continue to be paid in accordance with Clause 4 and except as aforesaid all other provisions of this Charter shall apply until redelivery. | 392 393 394 395 396 397 398 399 400 401 402 403 404 405 406 407 408 |
| **War Bonus** | 32. Any war bonus to officers and crew due to vessel's trading or cargo carried shall be for Charterers' account. | 409 410 |
| **Requisition** | 33. Should the vessel be requisitioned by the government of the vessel's flag during the period of this Charter, the vessel shall be deemed to be off hire during the period of such requisition, and any hire paid by the said government in respect of such requisition period shall be retained by Owners. The period during which the vessel is on requisition to the said government shall count as part of the period provided for in this Charter. | 411 412 413 414 415 416 |
| | If the period of requisition exceeds.........................................months, either party shall have the option of cancelling this Charter and no consequential claim may be made by either party. | 417 418 419 |
| **On/Off-hire Survey** | 34. Prior to delivery and redelivery the parties shall each appoint surveyors, for their respective accounts, who shall conduct joint on-hire/off-hire surveys. A single report shall be prepared on each occasion and signed by each surveyor, without prejudice to his right to file a separate report setting | 420 421 422 423 |

forth items upon which the surveyors cannot agree. If either party fails to have  424
a representative attend the survey and sign the joint survey report, such party  425
shall nevertheless be bound for all purposes by the findings in any report  426
prepared by the other party. On-hire survey shall be on Charterers' time and  427
off-hire survey on Owners' time.  428

**Stevedore Damage**    35.  Any damage caused by stevedores during the currency of this Charter  429
shall be reported by Captain to Charterers or their agents, in writing, within 24  430
hours of the occurrence or as soon as possible thereafter. The Captain shall  431
use his best efforts to obtain written acknowledgement by responsible parties  432
causing damage unless damage should have been made good in the mean-  433
time.  434

Stevedore damages involving seaworthiness shall be repaired without  435
delay to the vessel after each occurrence in Charterers' time and shall be paid  436
for by the Charterers. Other minor repairs shall be done at the same time, but if  437
this is not possible, same shall be repaired while vessel is in drydock in  438
Owners' time, provided this does not interfere with Owners' repair work, or by  439
vessel's crew at Owners' convenience. All costs of such repairs shall be for  440
Charterers' account. Any time spent in repairing stevedore damage shall be for  441
Charterers' account.  442

·    Charterers shall pay for stevedore damages whether or not payment  443
has been made by stevedores to Charterers.  444

**Charterers' Colors**    36.  Charterers shall have the privilege of flying their own house flag and  445
painting the vessel with their own markings. The vessel shall be repainted in  446
Owners' colors before termination of the Charter. Cost and time of painting,  447
maintaining and repainting those changes effected by Charterers shall be for  448
Charterers' account.  449

**Return Premium**    37.  Charterers shall have the benefit of any return insurance premium  450
receivable by Owners from their underwriters as and when received from  451
underwriters by reason of vessel being in port for a minimum period of 30 days  452
if on full hire for this period or pro rata for the time actually on hire.  453

38.  The vessel shall be off hire during any time lost on account of vessel's  454
non-compliance with government and/or state and/or provincial regulations  455
pertaining to water pollution. In cases where vessel calls at a U.S. port, Owners  456
warrant to have secured and carry on board the vessel a Certificate of Financial  457
Responsibility as required under U.S. law.  458

This Charter Party is a computer generated copy of the ASBATIME (1981) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licencee or end user as appropiate and not by the author.

**LB CHARTERING LLC.**                   – M/V "BENARITA" CPDD November 20th, 2009

**Clause 39.      Vessel's Particulars:**
**M/V "BENARITA"**
Norwegian Flag Built 1984
40,688 mtdwt on 11,187 m ssw
Loa 182,75 m / beam 30,00 m
Grt 23,594 / nrt 13,370
5 holds/hatches; 4 x 25 tons cranes with 4 x 8 cbm grabs
50,868 cbm gr / 49,192 cbm bale
Constant 350 excluding fresh water
Collapsible Steel Stanchions
About 12,5 knots laden on 25 tons IFO + 0,8 MDO
About 12,5 knots ballast on 23 tons IFO + 0,8 MDO
Port consumption:
Idle:                  1,5 metric tons IFO + 1,0  metric tons MDO
Working    8 hours: 1,5 metric tons IFO + 2,25 metric tons MDO
              16 hours: 1,5 metric tons IFO + 2,75 metric tons MDO
              24 hours: 1,5 metric tons IFO + 3,25 metric tons MDO
Bunker specs: IFO; RMG 380 ISO 8217, 2005 and later revisions
                      MDO; DMB ISO 8217 2005 and later revisions
Vessel consumes extra MDO when manoeuvring in/out of ports, narrow straits, changing ballast etc
Charterers not allowed to mix different supplies of IFO in same bunker tanks but allowed to maximum
different supply of MDO (provided same grade).

All details "about" and "without guarantee"

TPC:  about 46.99
Dwat at 10.50 M SW: about 37,450 metric tons

**Clause 40.      Cargo Exclusions:**
The following cargoes are specifically excluded under this Charter Party:
Livestock, petroleum and its products (petcoke permitted), bitumen, asphalt in bulk, tar, pitch, nitrate of soda,
ammonium nitrate (except fertilizer grade in accordance with IMO regulations 5.1, and as far as vessel's certificates
permits – any additional certificates required to be for Charterers' account.), peroxide, calcium carbide, calcium
hydrochloride, potassium nitrate, sodium sulphate, copper carbide, ferro silicon, zinc ash, saltpetre, DRI, CBI, HBI,
granite, pyrites, borax, charcoal, pond coal, quicklime, bonemeal, bulk flour, expellers, jute, esparto, grass, copra,
cotton, motor blocks and turnings, creosote, hides, bones, wet fish, fishmeal, turpentine, asbestos, naphtha, motor
spirit, acids, arms, ammunition, explosives, blasting caps, nuclear materials, nuclear and toxic waste, spent oxide,
radioactive products and waste, all dangerous, injurious, hazardous and inflammable cargoes. West Africa logs
excluded.

Silica sand is not the first cargo.
Chilean Nitrate to be loaded as per IMO regulations.

Prior loading salt or sulphur, materials and equipment for lime washing to be provided by Charterers, crew to effect
same and vessel to remain on hire during lime washing.

Cement and clinker are allowed.

Soda ash not to be first or last cargo.

Scrap Clause:
Cargo for the purpose of this clause shall mean non-oily scrap metal, excluding motor blocks, metal borings, shavings
and turnings. The Charterers are allowed to load shredded scrap metal, including HMS1 and HMS2, provided same is
soft loaded as outlined below.

"First load of scrap loaded in each hold to be lowered as close as possible to the bottom of the hold so as to provide a proper flooring and cushion to master's satisfaction before loading the balance of the cargo. Charterers/shippers/receivers have the option to load and/or discharge per grabs and/or buckets. Charterers'/shippers'/receivers' option to attach grabs/buckets to ship's gear. Owners allowing the use of forklifts/dozers in loading and discharging provided same does not exceed vessel's tank top strength. The vessel to provide electrical power, as onboard, for the proper working of grabs attached to ship's gear, always considering vessel's relevant capacity, connection with switch and fuses to be installed by Charterers in their time and expense."

<u>Carrying Logs</u>
For carrying logs Owners agree crew to provide following services:

- Erect/dismantle stanchions for deck cargo and unlashing of deck cargo (basis 1/1):
  lumpsum USD 5,000. Intermediate lashing/unlashing USD 500 per operation.
- Erect/dismantle catwalk: lumpsum USD 1,000.
- Removal of dunnage: lumpsum USD 500.
- If required, place hired lashing material (i.e. lashing material not belonging to the vessel)
  and dunnage on quay at cost to be agreed with vessel's master.

In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the vessel as a result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded. Damages caused to the vessel and/or equipment during the loading, stowing, carrying and discharging of logs to be for Charterers' account.

**Clause 41.      Trading exclusions:**
Trading always within Institute Warranty Limits and always excluding the following countries:
Israel, Greek occupied Cyprus, Kampuchea, North Korea, Albania, Somalia, Ethiopia, ex Yugoslav Republics, Iraq except U.N. approved cargoes, CIS Pacific and Siberian ports, Nigeria, Sudan, Myanmar, Azov Sea during winter, and Sayo, Cuba, Laos, Zaire, Haiti, Liberia, war and warlike zones. No direct sailing between mainland China and Taiwan.

Charterers not to trade vessel breaking I.W.L. unless Owners' prior consents obtained which not to be unreasonably withheld. Charterers to pay additional premium for breaking I.W.L against copy of original vouchers but always maximum as per Lloyds of London scale.

Calling Nicaragua and El Salvador is allowed.

Owners will endeavour to assist Owners for calling safe ex Yugoslav Republics and Haiti in case the need arises.

**Gulf of Aden Clause:**
Owners confirm their agreement to proceed via Gulf of Aden at any time during currency of the charter. Vessel to follow recommended route and have liberty to reduce or increase the speed if circumstances require so. any time lost waiting for convoys, following recommended routing, timing, or reducing speed or taking measures to minimise risk, shall be for the charterers' account and the vessel shall remain on hire;

Charterers are responsible for reimbursement of the additional war risk premiums imposed by H + M underwriters. Charterers shall pay the premiums upon presentation of the invoice from underwriters. Rate of premiums shall not be in excess of the ongoing rate in London market.

Prior entering the Gulf of Aden piracy risk areas, Charterers to pay the owners a lump sum amount of USD 45,000.00 to cover crew bonuses, additional wages, crew insurance, Kidnap and Ransom , Loss of hire and other piracy related insurances.  The above amount shall be reimbursed to the owners by the charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

Charterers, upon payment of the above lumpsum to be kept entirely free from any claim whatsoever relating from piracy and alike which may arise during the passage of the Gulf of Aden till passing Fujairah.

The vessel to proceed with the first Military convoy available.

**LB CHARTERING LLC.** — M/V "BENARITA" CPDD November 20th, 2009

**Clause 42.      War Risk Insurance:**
Basic war risk insurance premium for world-wide trading shall be for Owners' account and additional premiums for hull and machinery and Officers/crew and crew war bonus, if any, due to the vessel's trading to the restricted areas shall be for Charterers' account, but such trading always to be subject to Owners' prior approval. Same not to be unreasonably withheld, however, if such insurance is not obtainable commercially or through a government programme, the vessel shall not be required to enter or remain at any such port or zone. If war situation becomes serious, Owners will have the right to refuse the vessel entering into a war zone and Owners and Charterers shall further discuss in good faith on alternative arrangement.

**Clause 43.      Panama/Suez Canal Transit:**
Owners guarantee that the vessel shall be fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificates during the currency of this Charter to comply with current regulations and requirements of both canals.

**Clause 44.      Boycott:**
If the vessel is boycotted, picketed, blacklisted or if any similar incident occurred at any port or place by shore and/or port labours and/or tugboats and/or pilots, or by government and/or any authority by reason of the vessel's flag or registry or manning or ownership/management or terms and conditions on which members of the Officers/crew are employed, or by reason of trading of this vessel or by reason of the vessel's construction and/or her cargo gear and/or her fitting and/or her other equipment, any direct loss and any extra expenses incurred therefrom to be for Owners' account and Charterers are entitled to place the vessel off-hire for any time lost by such reasons.
Charterers shall not trade the vessel to any port or place where the vessel is known to be boycotted by shore and/or port labours and/or tugboats and/or pilots or by government and/or authority by reason of the vessel's flag/registry.

**Clause 45.      War Cancellation:**
If war breaks out between any two or more of the following countries;
United Kingdom, U.S.A., C.I.S. (ex. U.S.S.R.), People's Republic of China, France, Norway, Japan and Panama directly affecting the performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall redeliver the vessel to Owners, if she has cargo on board after discharge thereof at destination or, if debarred from reaching or entering it, at a near open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by Charterers. When the port where the vessel stays could not be regarded as a safe port because of the major war, then the vessel not to be redelivered until she enters into the safe zone outside the port. In all cases hire shall be paid until the vessel's redelivery.

**Clause 46.      Requisition:**
Should the vessel be requisitioned by the government of the vessel's flag during the period of the Charter the vessel shall be deemed to be off-hire during the period of such requisition and any hire paid by the said government in respect of such requisition period shall be retained by Owners. In the event of such requisition, Charterers shall have the option to cancel the balance period of this Charter.

**Clause 47.      Deratting Certificate:**
The vessel shall be delivered with a valid deratting or deratting exemption certificate. If such certificate dose not cover the whole period of the Charter, costs of renewal of certificate and any required fumigation for obtaining of such certificate, if necessary, shall be for Owners' account. However, if because of cargo the vessel have been sent to an infected port or ports where fumigation is ordered whilst on Charter by Charterers, cost and time to be for Charterers' account.

**Clause 48.      Quarantine:**
Normal quarantine time and expenses for the vessel's entering port shall be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, epidemics and illness of Captain, officers and crew shall be for Owners' account.

**Clause 49.      Cargo Gear and Equipment:**
The vessel's cargo gear and all other equipment shall comply with the regulations and/or requirements in effect at the port or ports of call, canals and countries in which the vessel will be employed, Owners also guarantee that the vessel shall be at all time in possession of a valid and up-to-date certificate on board to comply with such regulations and/or requirements.

**LB CHARTERING LLC.**      – M/V "BENARITA" CPDD November 20th, 2009

If stevedores, longshoremen or other labours are not permitted to work by reason of any failure of the Captain, Owners and/or their agents to comply with such regulations or by reason that the vessel is not in possession of such valid and up-to-date certificates, then Owners shall take immediate corrective measure.
Charterers may suspend hire for time lost thereby and any extra expenses including stevedore standby time shall be for Owners' account.

**Clause 50.       Stevedores:**
Charterers are not responsible for stevedore or other damage to the vessel or her fittings unless Charterers or their agents are notified in writing by the Captain or Owners' agents within 48 hours of occurrence of damage, except in case of hidden damage which to be notified as soon as practicable or latest upon completion discharge. Should a stevedore damage be caused, Master is obliged to try to let stevedores repair the damage and to try to settle the matter directly with them in the first stage.
Failing this, Master will endeavour to obtain signed acknowledgement of the damage and liability for the same of the stevedores.  Any stevedore damage affecting seaworthiness to be repaired without delay at Charterers' expenses and time.  Owners accept redelivery without Charterers repairing any minor stevedore damage and in such case Charterers to pay for cost and time estimated by joint off-hire surveyor of repairing such stevedore damages, unless repairs are effected simultaneously with dry-docking or other repair for Owners' account and no loss of time incurred.

**Clause 51.       P&I Club:**
Owners guarantee that the vessel shall be fully covered by P&I Club. Charterers have the benefit of Owners' granted by the P & I Club as far as the rules permit.

**Clause 52.       NYPE Interclub Agreement:**
Liability for cargo claims shall be borne by Owners and Charterers in accordance with NYPE Interclub Agreement 1996 and any subsequent amendments thereto.

**Clause 53.       Owners' Agents:**
Charterers will have their agents to attend the vessel's normal matters without charging agency fees. However, should Charterers' agents disagree or should there be an extraordinary matter such as attending to crew's hospitalization or survey work for Owners' account, Owners shall employ Charterers' agents as Owners' husbandry agents and pay agency as per local recognized tariff or Owners shall appoint their own husbandry agents at their expense.

**Clause 54.       Deductions:**
Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel. In no event shall Charterers procure, or permit to be procured, for the vessel, any supplies, necessaries or services without previously obtaining a statement signed by an authorized representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of Charterers and not on the credit of the Vessel or of her Owners, and that the furnisher claims no maritime lien on the Vessel therefore. Charterers port agents to furnish confirmation that port disbursement are paid in advance and no fund will be acclaimed against the vessel and/or Owners. In case of failure to present the required acknowledgement or evidence of advance payment, Owners/Master have right to refuse acceptance of such services/supplies.

**Clause 55.       Surveys:**
Joint on/off hire survey to be carried out on delivery and redelivery to ascertain the vessel's condition and bunker quantity remaining on board on delivery/redelivery. Owner's option to be represented by Master / Chief Engineer for this survey in which case cost of survey to be for Charterers account or by the party ordering this survey.

**Clause 56.       Self-discharging Clause:**
Owners will place at Charterers disposal ship's cranes and grabs as on board.
Crew to operate cranes for self-load/discharge against Charterers paying USD 4,000 per operation.

**Clause 57.       Deviation/Put Back:**
Should the vessel put back whilst on voyage by reason of breakdown of machinery, collision, stranding, fire or the accident of damage to the vessel, or dry-docking or periodical survey, or deviate from the course of the voyage caused by sickness of or accident to the Captain, Officers, crew or any person on board the vessel other than persons travelling at Charterers' request, or by reason of sending stowaway or refugee, salvage, or by reason of the refusal of the Captain, Officer or crew to do their duties without any specific and valid ground for rejection, or any Owners'

matters unless caused by default of Charterers and/or their staff and/or their agents, the payment of hire shall be suspended from the time of inefficiency in port or at sea until the vessel is again efficient in the same position or regains a point of progress equivalent to that the hire ceased hereunder. Bunkers consumed while the vessel is off-hire and all extra expenses incurred during such period shall be for Owners' account.

**Clause 58.      Capture, Seizure, Arrest:**
Should the vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this Charter Party, for any reason attributable to Owners, the payment of hire shall be suspended until the time of her release. Any extra expenses incurred by and/or during such capture of seizure or detention or arrest shall be for Owners' account, unless caused by Charterers and/or their agents.

**Clause 59.      Smuggling:**
Any delay, expenses and/or fines incurred on account of smuggling shall be for Owners' account if caused by the Officers and/or crew, or shall be for Charterers account if caused by Charterers' supercargo and/or their staff or agents.

**Clause 60.      Return premium:**
Charterers shall have the benefit of any return insurance premium receivable by Owners from their Underwriters by reason of the vessel being in port for a minimum period of 30 days if on full hire for this period or pro-rata for the time actually on hire, but Owners not to be held responsible for any deficiency in speed/consumption due to foul bottom as a result of prolonged stay in port.

**Clause 61.      Hold Condition on Redelivery:**
Charterers to have the option of redelivering the vessel against paying Owners lumpsum  USD 5,000.00 in lieu of hold cleaning.

**Clause 62.      Gangway Watchmen:**
Expenses for gangway watchmen, if ordered by the vessel to be for Owners' account, but if ordered by Charterers or required by a port regulation, except in the case such watchmen are necessitated due to nationality or conduct of any of the ship's members, such expenses shall be for Charterers' account.

**Clause 63.      Additional equipment, fittings: Deleted.**

**Clause 64.      Banking Details:**
Beneficiary:  Progress Bulk Carriers Ltd., Nassau, Bahamas
A/C # 02D02/201143
IBAN: GB91BNTB40482010052591

Beneficiary's Bank:  Butterfield Bank (Guernsey) Ltd.
                     Guernsey, Channel Islands
Swift Code:          BNTBGGSX

Butterfields Bank A/C # with Intermediary Bank:  0544-7-11230

Intermediary Bank:  JPMorgan Chase Bank, New York
Swift Code:         CHASUS 33
ABA #:              021000021

**Clause 65.      Tax:**
All taxes on cargo and on voyage freights to be for Charterers' account.

**Clause 66.      Paramount Clause:**
Clause Paramount, U.S. Clause Paramount, Canadian Clause Paramount, U.K. Clause Paramount, Hague rules and/or Hague Visby Rules wherever applicable shall be deemed to form a part of this Charter Party and shall be contained in Bill of Lading issued hereunder. Baltime War Risk Clause 1993 as per under noted, P&I Bunker Clause also form part of this Charter Party.

**LB CHARTERING LLC.**                    – M/V "BENARITA" CPDD November 20th, 2009

**Clause 67.**
Owners warrant that vessel's hatch covers are watertight and if any hatch cover found defective, same shall be rectified at Owners time and expense to class satisfaction. All hatch covers shall be carefully tended by crew to prevent leakage.
Charterers' option to perform water hose test and/or uld (ultrasonic leak detection) test at any time during the currency of this Charter Party.

**Clause 68.**
In case of non presentation of original Bills of lading at discharge port/s Master to discharge the cargo onboard against Charterers LOI in Owners' P and I club wording signed by Charterers only.

**Clause 69.        ITF Clause:**
Owners warrant that the vessel's crews are always employed under terms/conditions acceptable to ITF or its affiliates. Any cost or loss of time due to Owners' failure to comply with the above to be for Owners' account.

**Clause 70.        Oil Pollution:**
Charterers shall bear no responsibility for all consequences (including fines if any imposed to Charterers) or oil or other pollution damage and any time lost due to pollution of oil or its consequences shall be deemed off-hire unless Owners prove that the oil pollution is caused by Charterers' representative/Charterers' agents/Charterers' servants. Owners particularly warrant that the vessel performing under this Charter fully complies with Japan Ocean Pollution Prevention Law 1970 and Oil Pollution Act 1990 and United States Coast Guard Regulations currently in force at the time of delivery, If the effect of coverage by P&I Club will be available throughout the period of this Charter. In case of new laws or regulations introduced to the trade incurring substantial risks or expenses to Owners, Charterers and Owners shall discuss in a bona fide spirit in terms of complying to a new requirement.

**Clause 71.**
Export and/or import permits for cargo and trade to be at Charterers' risk and expenses. Taxation for levies in respect of cargo and trade to be for Charterers' account and to be paid by Charterers.

**Clause 72.**
The vessel is a self-trimming bulk carrier, upper ends of holds customarily excepted. For grain cargoes the vessel complies with Chapter VI of SOLAS 1974.

**Clause 73.**
Charterers' option to add any off-hire to Charter Party period.

**Clause 74.**
Owners are to give Charterers not less than 20/15/10/7/5 days approximate and 3/2/1 days definite notice of vessel's expected date of delivery, and probable port.

**Clause 75.**
Before and upon arrival at a port the vessel's Officers/crew to shape up the vessel's hatches, cranes/derricks and gangway in order to commence loading and/or discharging without any delay. Opening/closing of all hatch covers shall be done by Officers/crew free of cost to Charterers, if allowed by shore regulations.

**Clause 76.**
Within the context of this Charter Party "good weather conditions" are to be taken as wind speed (16 knots max) and sea condition not exceeding Douglas Sea State 3/Beaufort Force 4. Charterers have the option to supply weather routing service to the Master and in such case master to comply with reporting procedure at all times.
However, the final decision as to the route selection and navigation of the vessel will be the Master's. Evidence of weather conditions will be taken from the vessel's deck logs and independent weather bureau reports.
In case of discrepancies between the deck logs and weather routing report, the weather routing report to be taken as ruling.

**Clause 77.**
Master and crew shall co-operate with Charterers, receivers or their representatives insofar as local regulations permit to facilitate loading and discharging operations.

**LB CHARTERING LLC.**  – M/V "BENARITA" CPDD November 20th, 2009

**Clause 78.**
Owners are obliged to deliver the vessel with all necessary and valid certificates such as (but not limited to) international tonnage certificate, deratization certificate, safety and health certificates, cargo handling gear certificates and similar, and all such certificates to be kept in valid condition by Owners throughout the period of the Charter.

**Clause 79.**
The vessel to comply with and be maintained in accordance with the requirements of the Commonwealth of Australia's Loading and Unloading Safety Measures Regulations. The vessel to be fitted with hold ladders acceptable for  New Zealand and Australian trade.

**Clause 80.**
Where there is failure to make punctual and regular payment of hire or any amounts due to owners due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners twenty four (24) hours written notice to rectify the failure, and when so rectified within those hours following the Owners' notice, the payment shall stand as regular and punctual. Failure by the Charterers to pay the hire within twenty four (24) hours of the Owners notice as provided herein, shall entitle the Owners to withdraw the vessel from Charterers' service. At any time while hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be absolutely entitled to withhold the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire shall continue to accrue and any extra expenses resulting from such withholding shall be for Charterers' account.

**Clause 81.**
Time on delivery and redelivery to be based on GMT, but laycan to be based on local time.

**Clause 82.     U.S. Trade-Unique Bill of Lading Identifier Clause:**
Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CFR Part 4 Section 4.7.a) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

**Clause 83.  Deleted.**

**Clause 84.     Winch Breakdown:**
In the event of breakdown of a crane or cranes by reason of disablement or insufficient power, the hire to be reduced pro-rata for the period of such inefficiency in relation to the number of cranes available. However, should a breakdown of a crane or cranes result in Charterers being unable to work at a particular hatch, then hire is to be reduced pro-rata in relation to the number of hatches workable. Owners are to pay, in addition the cost of labour affected by the breakdown, either stood off or additionally engaged. This does not exempt Owners from liability for the cost of hiring shore appliances in accordance with Clause 21, but the vessel is to be on-hire whilst such shore appliances are available. If such breakdown is caused by stevedores or other servants of Charterers, this Clause shall not apply.

**Clause 85.     Double Banking:**
The vessel to lie alongside barges/coasters/lighter at a safe dock or wharf or place (including anchorage) for transhipment and/or discharge of cargo and/or bunkering, if so ordered by port authority, or when such operation is customarily carried out at the port. Such operation to be carried out always under the control of Master regarding the general safety, who may at any time order the barges, Coasters/lighter away from vessel meanwhile Charterers to take normal customary precaution for such operation. Charterers shall supply at their time and expense fending to the Master's satisfaction, but always within normal shipping practice and custom of the port.

**LB CHARTERING LLC.**                — M/V "BENARITA" CPDD November 20th, 2009

**Clause 86.     Trading Shallow Harbour:**
In the event of the vessel trading to shallow harbour or to rivers or ports with bars, any detention of the vessel and/or expenses resulting from such detention to be for Charterers' account unless such detention and/or expenses or the cause by reason of which either is incurred be due or to be caused by the negligence of Owners' servants.

**Clause 87.     Bimco Standard ISM Clause:**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account."

**Clause 88.     Bunkers:**
Bunkers on delivery to be about 480 metric tons IFO and about 18 metric tons MDO.
Bunkers on redelivery to be about same quantity as on delivery.
No payment of bunkers on delivery/redelivery.
Charterers to bunker the vessel for their own account for the performance of the intended voyage.
Prices both ends: USD 480.00 per metric tons for IFO / USD 630.00 per metric tons for MDO.
During the currency of the charter Owners have the right to bunker the vessel on their own account.

**Clause 89.**
Charterers to have the right to use vessel's wireless station. Cables/entertainment/victualling USD 1,250.00 per month or pro rata.

**Clause 90.**
Hold cleaning between voyages to be performed by crew if required by Charterers and if permitted by local regulations.

Compensation to ship's crew for hold cleaning, white/lime washing and crane driving.
Hold cleaning after cement/cement clinker: USD  but in case Charterers arrange the shore labour for hold cleaning, then Charterers shall not compensate the same.
Hold cleaning after pet coke and white/lime washing: USD  per hold.
Ordinary hold cleaning: USD per hold.
Crane driving: USD per operation.

Master/vessel/Owners are not to be held responsible should the vessel fail to pass hold condition inspection/survey due to intermediate cleaning, and no loss of hire to accrue.

**Clause 91**
Owners' option to sell the vessel during the Charter Party period, but Charter to be maintained. Same is subject to Charterers' approval of buyers, which not to be unreasonably withheld.

**Clause 92.     LMAA SMALL CLAIM PROCEDURE**
Exceeds the sum of USD 100,000.00 the arbitration shall be conducted in accordance with the LMAA small claims procedure current at the time when the arbitration procedures are commenced.

**Clause 93.     Seaway bill**
Charterers have the option to use waybill instead of Bill of Lading with Owners' consent.

**Clause 94.**
First hire to be paid within three (3) banking days after vessel's delivery.

**LB CHARTERING LLC.**                    – M/V "BENARITA" CPDD November 20th, 2009

**Clause 95.**
Vessel's holds on delivery or at first load port to be clean, swept, washed down by fresh water and dried up so as to receive Charterers intended cargoes in all respects free of salt, loose rust scale and previous cargo residues to the satisfaction of the independent surveyors.
Should the vessel not be approved by the surveyor then vessel to be placed off-hire from the time of failure of inspections until vessel is fully accepted. Any directly related expenses due to such failure to be for Owners' account.

**Clause 96.**
**Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005:**
(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes with exception where sampling is done on supplying barge side in accordance with local customs, regulations or suppliers policy.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content
when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

**Clause 97.      Piracy Clause:**
All parties shall endeavour to take all available measures to diminish the threat of pirates off the coast of Somalia. Master is at liberty to take all necessary steps to safeguard the vessel and her cargo crew including but not limited to navigating as far away from the Somali shores as he judges appropriate and/or follow the instructions of United Nations members warships in sailing in daytime only or following convoys and adjusting vessels speed accordingly.

**Clause 98.   HBI Protective Clause:**
Charterers to be allowed to carry 1 cargo of HBI.

Charterers to have the option to carry maximum one (1) cargo of HBI during this Charter which to be loaded in accordance with IMO regulations and The International Group of P and I Club recommendations.

Charterers to arrange for hatches to be sealed with Ramneck tape at their time/expense provided same is required by owners P and I Club and/or head Charterers.

**LB CHARTERING LLC.** — M/V "BENARITA" CPDD November 20th, 2009

## CONWARTIME 1993

(1) For the purpose of this Clause, the words:

    (a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

    (b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is impose selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4) (a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

    (b) If the Underwriters of such insurance should require payment of premiums and/ or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The Vessel shall have liberty:-

    (a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

**LB CHARTERING LLC.**  – M/V "BENARITA" CPDD November 20th, 2009

(e) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

## ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.
(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.
(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## AMS Clause for Time Charter Parties

Sub-clause (a) defines the Charterers as the carrier for the purpose of U.S. customs regulation (19 CFR 4.7). Furthermore, the sub-clause assigns the responsibility for compliance with the regulation to the Charterers and, as a precaution, if requires the Charterers to provide the Owners with timely confirmation that the I.C.B. and S.C.A.C are in place.

**LB CHARTERING LLC.**                    – M/V "BENARITA" CPDD November 20th, 2009

Sub clause (b) indemnifies the Owners for any loss or damage arising as consequence of the Charterers non compliance with the rules. A special provision has been inserted to deal with the question of hire during periods when delay occurs as a result of the Charterers failure to comply with the regulation as outlined in sub-clause (a); in these instances the vessel will remain on hire.

According to the A.M.S. rules, and as mentioned earlier other changes than those relating to the A.M.S. regulation under the particular Charter Party can be drawn on the I.C.B, sub-clause (c) provides that the Charterers will be reimbursed for charges drawn on the I.C.B., when these charges are solely the responsibility of the Owners.

Sub-clause (d) expressly provides that the Charterers assuming the role of carrier, does not prejudice the identity of carrier under any Bills of Lading, other contract or regulation.

**Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005**

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content
when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.


              **OWNERS:**                                        **CHARTERERS:**